IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:18-cv-01685-RBJ
*consolidated with* 1:20-cv-00846-RBJ

JAMES PAUL KALHORN,

     Plaintiff,

v.

ANDY PHAM,

     Defendant.

---

FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER OF JUDGMENT

---

     This case was tried to the Court March 29–30 and April 1–2, 2021.  The Court has also reviewed the parties' post-trial briefs.

## FINDINGS OF FACT

**A.  <u>The Characters</u>.**

1.     James Paul Kalhorn, DDS, the plaintiff in Case No. 18-cv-01685-RBJ, is a dentist practicing in Colorado Springs, Colorado.  On the side he has various business investments, one of which was in a tequila manufacturing and distributing company, Xamay Importers, Inc., doing business as Alma de Agave Tequila.  In June 2000 he was indicted in this district with 45 counts arising from allegedly fraudulent billing practices at his dental office.  Ultimately, he pled guilty to one misdemeanor count of knowingly and willfully making false statements in an application for benefits under a federal health and medical program.  He was sentenced to two years' probation, 100 hours of community service, a $5,000 fine, and restitution to victims in the amount of $25,000.  His dental license was temporarily suspended by the Colorado Dental

Board.  In 2008 Kalhorn pled guilty in Las Vegas to one misdemeanor theft count arising from his failure to make good on a large "marker" he had established at a casino, which his counsel explained was due to his having filed bankruptcy proceedings.

2.       Prometheus Dos, Inc., the plaintiff in Case No. 20-cv-00846-RBJ, is a Nevada corporation created by Kalhorn with the single purpose of investing in the Xamay tequila business.  Prometheus Dos is owned 50-50 by Kalhorn and David Pate, a Nevada tennis coach whom Kalhorn met as a result of his children's junior tennis accomplishments that took them to Las Vegas, among other places.

3.       Prometheus & Atlas Real Estate Development, LLC, is another entity created by Kalhorn after Kalhorn became involved in the events giving rise to the two consolidated cases in this Court.

4.       Andy Pham, the defendant in both of the consolidated cases, is a real estate investor and developer.  Essentially, he finds real estate opportunities, puts together groups of investors, purchases the property, and either develops it or resells it.  At various times he has had as many as 20 to 30 deals going at the same time, typically in the names of separate limited liability companies he creates for each new deal.  He was the managing member of a Nevada limited liability company called Caballos de Oro Estates, LLC, which in turn owned certain property in Las Vegas that is a central focus of this case.

5.       Robert Krilich is a Chicago businessman who, during the period in question in this case, resided "off and on" in Las Vegas.  He has a criminal history including drug problems and possibly financial fraud of some kind.  He apparently was in prison at some time before the trial in this case, on unrelated matters, but he was believed to be in Lake Tahoe at the time of trial.  Krilich and Kalhorn were social friends for about ten years before the events of this case. Krilich did not testify in the present case, but he was extensively deposed in what has been

labeled as the "quiet title" action that is pending in Las Vegas. The parties to the present case have provided the deposition transcript and have stipulated that this Court could review it if desired. I have reviewed portions of the transcript.

6.      Jihad Anthony Zogheib is an associate of Krilich. Zogheib did not testify in the present case. An attempt to take his deposition was made in the quiet title action at a time when he was an inmate in the Nevada Southern Detention Center in Pahrump, Nevada, on charges unrelated to the present case. However, he terminated the deposition shortly after it began. He apparently remains in prison to this day.

7.      Csaba Meiszburger is a Nevada-based businessman, primarily in the cosmetics sales business. He also dabbled in real estate projects. Meiszburger was a business associate and close friend of Zogheib. He also knew Krilich and Pham. He did not testify in the present case, but his deposition was taken in the quiet title action. The parties stipulated that this Court could review the deposition transcript if it desired, and I have reviewed portions of it. According to the parties and counsel in the present case, Meiszburger's present whereabouts are unknown.

8.      Thomas ("Tommy") Kordick is a whiskey distiller and real estate investor in Las Vegas. He is a longtime friend of Kalhorn and was involved in some of the events leading to Kalhorn's supposed investment in the Las Vegas property, as well as in Kalhorn's fledgling attempts to develop the property. He was an investor in Xamay, the tequila company. He also has been associated with Zogheib and Meiszburger.

9.      Matthias Bober is a self-employed businessman in Colorado Springs, Colorado. He was solicited by Kalhorn, his dentist and friend, to consider an investment in the tequila company. He backed out of the potential investment after learning of things Pham was saying and publishing about Kalhorn.

**B.  <u>The Lone Mountain Property</u>**.

10.     In 2005 Pham, on behalf of his limited liability company Caballos de Oro Estates, LLC ("Caballos"), purchased an undeveloped five-acre property in the Las Vegas, Nevada area for $4,950,000. The majority of the funding was provided by 85 investors. Another Pham entity, Sunbelt Nevada Properties Management II, LLC ("Sunbelt"), became the managing member of Caballos. The property is on a hillside and is sometimes referred to as the Lone Mountain property or the Buckskin property because it borders Buckskin Street.

11.     Pham's plan was to develop the property with some type of residential units. However, before that took place the economic downturn in the 2007-2009 time period made development impractical. Therefore, according to him, he elected to sit on the property until the financial picture improved enough to enable him either to develop it or sell it. Nothing of significance had taken place with respect to either development or sale of the property prior to November 2015.

12.     Pham was paying little attention to the property or to Caballos at that time, probably because he was juggling so many LLCs and projects. Indeed, several years before the events of this case he allowed Caballos's status as a registered Nevada LLC to be revoked for failure to comply with the Secretary of State's requirement that an LLC's manager log in annually, update contact information if necessary, and pay a nominal fee. Later, but still before the events of this case, instead of resurrecting Caballos, he created another Caballos. The parties referred to the two entities as Caballos I and Caballos II during the trial, but those were just litigation labels; both entities had exactly the same name. The situation was complicated by Pham's failure to formally transfer the Lone Mountain property from the old Caballos to the new one – he assumed that the new Caballos automatically owned what its predecessor owned. A further complication occurred when, while this trial was in progress, Pham finally did pay several years' worth of overdue registration fees and resurrect the old Caballos.

13.     Pham was acquainted with Meiszburger who had worked with him on a Pham project near the Lone Mountain site called "The Square."  In his deposition Meiszburger claimed that he volunteered to try to help find a buyer for the Lone Mountain property as a favor because he perceived that Pham was under substantial stress.

14.     Meiszburger informed his friend Zogheib about the Lone Mountain property. They in turn informed Krilich about the property.

15.     Zogheib and Meiszburger had accumulated a number of debts related to gambling and other matters, and they were under pressure to address them.  However, they were not in a position to obtain funds from a bank.  Meiszburger had gone through a bankruptcy, and Zogheib was unwilling (and apparently unable) to go anywhere near a bank, in Kalhorn's words.  They were looking for a private loan.  Krilich was helping them, and Krilich's friend Tommy Kordick was helping Krilich.  Apparently, they approached several possible lenders, including Krilich's father who was a Chicago-based developer, but none of them was interested.

16.     Ultimately, Zogheib, Meiszburger, and Krilich came up with a scheme to use the Lone Mountain property as a means of obtaining cash to pay down Zogheib's and Meiszburger's debts and provide some money for Krilich as well.  The essence of the scheme was to claim that Zogheib and Meiszburger owned the property, and that Pham was just a front man for them. Zogheib and Meiszburger would use the property to obtain money from anyone who would lend money with the property as collateral.

17.     No evidence was presented in this trial that Kordick was in on the scheme.  He was told in late November 2015 that Meiszburger and Zogheib owned the property, that Pham managed the property for them, and that they hoped to find someone to lend money on the property.  Kordick testified during the trial that Zogheib and Meiszburger had discussed two different properties for this deal, the other being The Square.  Krilich supposedly chose the

Caballos property because he thought it was better. A year or more later Kordick learned that The Square had been developed by Pham and was not owned by Zogheib or Meiszburger.

18.     On November 27, 2015, shortly after he became involved, Kordick found an 800 phone number for Sunbelt Property Management on the Internet and attempted to call Pham at that number, apparently to confirm that Pham was the manager of the property and obtain more information. He testified that one of his reasons for doing this was that he knew Krilich and Zogheib had criminal records, and he wanted to verify that what they were proposing was legitimate. He didn't reach Pham but left a message asking that Pham call back as soon as possible. Kordick then called Krilich and mentioned his attempt to contact Pham. That call ended, but a few minutes later Kordick was on the phone with Krilich again when Zogheib called and was connected into the Kordick-Krilich call. Zogheib told Kordick that Pham was just a manager, and he rather sharply instructed Kordick to deal only with Zogheib or Meiszburger with respect to the property. Pham never returned the call despite Kordick's having left a message for him to call. He claims not to have learned of it until the pretrial discovery process in the Nevada litigation.

19.     Kalhorn's counsel argues that the timing of Zogheib's call suggests that he must have been connected to Pham in order to know about Kordick's call to Pham's number. However, there is no evidence that Pham ever knew or had any connection with Zogheib. A more reasonable inference, and the one I draw, is that Krilich told Zogheib that Kordick had attempted to contact Pham; and, realizing that if Kordick got through to Pham the whole scheme would unravel, Zogheib immediately called Kordick and headed off that threat. I also infer that the reason Pham didn't return the call is because neither he nor his office manager was paying attention to messages left at Pham's Las Vegas office. Pham testified that he gets so many calls every day that he can't respond to them all. He also testified that he never asked his former

office manager about the Kordick voice message after he became aware of it during the litigation because he didn't realize it was going to be a "big deal."

20.     Kalhorn was not yet in the picture when the Kordick/Krilich/Zogheib telephone calls took place.  But when their other efforts to find a lender failed, they turned to Kalhorn whom both Krilich and Kordick knew.

21.     On or shortly before December 27, 2015 Krilich informed Kalhorn of a potential business opportunity concerning the Lone Mountain property.  Krilich arranged for Kalhorn to meet with him, Meiszburger and Zogheib at the site.  He introduced Meiszburger and Zogheib who claimed to be the silent owners of the property.  Pham was mentioned as their front man who managed the property for them.  They said that they were getting ready to develop the property.  They supposedly had substantial assets but were in a temporary cash crunch and needed short-term money.  They proposed that if Kalhorn, who was credit-worthy at the time, would borrow the money they needed to pay off their debts (which initially were said to be about $1.2 million), they would repay him in 45 days plus $50,000.  If they failed to repay the loan, then Kalhorn would own the property and keep the $50,000.

22.     Krilich gave Kalhorn site maps and an appraisal of the property that Krilich had obtained from R.O.I. Appraisal.  Ex. 18.  The appraiser, William Geary, valued the property at $2,285,000 as of December 10, 2015.  *Id.*

23.     Remarkably, Kalhorn agreed to this proposal.  He says that he believed that Meiszburger and Zogheib owned the property, through Caballos, because their ownership was later confirmed by a legal opinion and a title policy.  He also believed that the appraised value of the property was in excess of the debt he was incurring.  It is difficult to believe that an educated and presumably intelligent individual would fall for this bizarre proposal, and it is at least possible that Kalhorn was in on the scheme.  However, the evidence presented in this case tends

towards Kalhorn's gullibility and greed rather than his knowing participation in the conspiracy to defraud Pham. Kalhorn testified that he was not aware when he did the deal that both Zogheib and Krilich had criminal histories, and that he would not have done the deal if he had known. I'm not so sure.

24.     The December 27, 2015 meeting at the site was the only time Kalhorn ever met with Meiszburger. He met with Zogheib one other time when Zogheib asked him to sign off on the Irving Trust loan (*see infra*). Kalhorn's contact on all other pre-loan matters was with Krilich.

25.     After Kalhorn agreed to this deal, a number of things took place to implement it. A document entitled "Membership Interest Purchase Agreement," dated December 27, 2015, stated that Kalhorn was acquiring the interests of Sunbelt and Pham's investors in Caballos. Ex. 19. The document was purportedly signed by Kalhorn and by Pham on behalf of Sunbelt and Pham's investors, but both Kalhorn's and Pham's signatures were forgeries. Both names were also forged on an "Assignment of Membership Agreement" of the same date. Ex. 20. Kalhorn received Pham's resignation as a managing member of Caballos dated December 30, 2015. Ex. 21. Pham's signature on this critical document was a forgery. There is an Operating Agreement dated as of December 2, 201**4** (obviously a typo) purporting to be signed by Kalhorn as the manager of Caballos. Ex. 16. Kalhorn testified that this signature was forged too.

26.     Kalhorn thinks he received those documents from Krilich sometime in January 2016 and perhaps not even then. Whenever he got them, he didn't notice that his signature was forged because he was relying on the legal opinion and title insurance and didn't worry about reading the paperwork.

27.     Kalhorn's counsel explained that he was offering these documents into evidence, despite the fact that Kalhorn's signature was forged, to show that there was a good faith basis for

Kalhorn to believe that he was legitimately acquiring the property. But by the end of the trial it appeared that Kalhorn and his lawyer had become resigned to the fact that Kalhorn never legitimately acquired Caballos or the property. It appears to this Court that the property is probably owned by Caballos de Oro, LLC (the original, resurrected version of Caballos); that the members of Caballos are probably as they originally were, i.e., Sunbelt and the investors; and that Pham or Sunbelt is probably still the managing member of Caballos. However, the ultimate membership of Caballos and ownership of the property will be resolved in the quiet title action in Nevada. This Court can only make findings based on the evidence presented in this trial and does so only to the extent necessary to resolve the legal issues presented in the cases before it.

28. Having gotten Kalhorn to agree to participate in the transactions, Zogheib still faced the problem that the record owner of the property was Caballos, and the managing member was still Sunbelt (Pham). So Zogheib, in the presence of Krilich, went on the Nevada Secretary of State's website on December 31, 2015 and changed the name of the managing member of Caballos from Sunbelt to Kalhorn. He used an email address of James.Kalhorn@yahoo.com to do this. This was not an email Kalhorn had ever used or had. Zogheib's abuse of the website was, of course, unethical and illegal, but the Secretary of State's procedure made it relatively easy to accomplish. Zogheib or Krilich paid the fee for making the change with Kordick's credit card. Kordick testified that he had provided the card to both of them to pay for an appraisal of the property, but he had not authorized either of them to use the card to make a change of managers at the Secretary of State's office.

29. Kalhorn claims not to have been involved with the change of managers on the Secretary of State's website, and he says that he didn't have "a clue" as to how that happened. He only learned that this had happened in January 2016, and according to him, he didn't see anything untoward about it, since he still thought the deal was legitimate. During a deposition in

a bankruptcy proceeding, he appeared to have testified that he had witnessed the change being made, but he corrected that testimony in subsequent depositions and during the trial. His trial testimony in this case that he was not present when Zogheib made this switch in the Secretary of State's records, and that he was not even in Las Vegas at the time, was credible.

30. When a change of this nature is made, the Secretary of State's office immediately generates an email notification to the record owner. An "alert" was indeed emailed to april@sunbeltpm.com on December 31, 2015, addressed to "Hi Andy," notifying Pham that "a filing has been completed for Caballos de Oro Estates LLC" and indicating that if he wanted to know more about this filing, "click here." Ex. 26.5. April had been an office manager in Pham's Las Vegas office. However, Pham either did not receive the alert or did not pay any attention to it.

31. I assume that Pham was not a participant in the fraud, as the evidence presented in this case did not support such a finding. Thus, his insistence that he did not learn about the change in managers from this "alert" is credible. He was in the process of moving his office to Idaho, which Meiszburger knew. Pham presumably would have "screamed bloody murder" had he known of the purported change of managers of Caballos when it happened, as he later did when he learned of it. In any event, this was not the only instance of inattention to matters related to Caballos. As discussed earlier, he (and apparently his office personnel) ignored a voice message that could have uncovered the fraud before Kalhorn became involved in it. They later paid no attention to several letters that were sent by the City of Las Vegas to Caballos at Pham's Las Vegas office address during the entitlement process instigated by Kalhorn. *See* Ex. 27-30. All of this reflects Pham's generally negligent management of Caballos. He didn't wake up to the fact that the ownership and management of Caballos had purportedly been changed from him to Kalhorn until about December 2016, nearly a year after the fact.

32.     On January 28, 2016 Kalhorn borrowed $1.2 million from the Eliot A. Alper Revocable Trust.  *See* Ex. 25.  The loan was made to Caballos and was arranged by Krilich.  It was documented with a promissory note and was secured by a deed of trust on the Lone Mountain property.  In addition, Kalhorn personally guaranteed repayment.  *See* Ex. 24.  A lawyer purportedly recommended by Mr. Alper, Rory J. Vohwinkel, provided an opinion letter that was apparently based on documents provided to him by Krilich.  Kalhorn interpreted this letter as confirming that Kalhorn was authorized to encumber the Lone Mountain property and to incur debt in the name of Caballos.  *See* Ex. 22.  The Alper Trust also obtained a title policy from Commonwealth Land Title that Kalhorn also relied upon as confirming Caballos's ownership of the property.

33.     By then, apparently realizing that they had a patsy on their hands, Zogheib and Meiszburger came back to Kalhorn for more money.  Although that caused him some concern, Kalhorn on behalf of Caballos nevertheless agreed to take out a second loan from the Irving Trust in the amount of $550,000.  He says that Zogheib told him that the second loan was already in place, and that all he needed to do was to sign and personally guaranty the note.  The second loan closed shortly after the Alper loan.  *See* Exs. 23, 24.  Although Kalhorn thought that Zogheib arranged for the second loan, it seems more likely that Krilich did so.  Zogheib not only had credit problems, but he was a recently convicted felon with no credit.

34.     Kalhorn used much of the money he borrowed from the Alper Trust and the Irving Trust to pay off loans and other debts for Zogheib and Meiszburger.  Exhibit 42 provides details of the payments that he made from Caballos's bank account at Chase Bank.  Some of the money also went to Krilich for what amounted to a handsome finder's fee.

35.     Predictably, Zogheib and Meiszburger did not repay any of the money they had borrowed from Kalhorn.  So, Kalhorn got his $50,000 fee (paid out of the money he borrowed),

and he became the owner, he thought, of the property. He paid Krilich to help him get started with the initial stages of developing the property, and his friend Kordick also was helping him. Kalhorn hired a couple of attorneys and an entitlement (surveys, utilities, zoning) expert. He formed a new entity, Prometheus & Atlas Real Estate Development, LLC to acquire the property from Caballos, because the "old Caballos" had been revoked due to Pham's failure to pay annual registration fees, and in any event Kalhorn wanted his property to be held by an LLC with a name of his own creation. Commonwealth Land Title provided a title policy to Kalhorn in connection with that transaction. David Pate, Kalhorn's friend and partner in Prometheus Dos, was also an initial member of Prometheus & Atlas. However, he wisely resigned before putting in any money or otherwise staying involved with it.

36. At some point either Caballos or Prometheus & Atlas listed the property for sale for $2.6 million. But Kalhorn continued to take steps towards development. He met with an architect who produced design drawings. His plan was to build between 58 and 70 residential units on the site. He claims to have put something in the range of $450,000 into this initial development work and his payments to Krilich.

37. Kalhorn has made no payments towards the principal of either of the loans he took out with the Alper and Irving Trusts, but he has made interest payments and paid taxes on the property. The trusts have sued him in Nevada seeking to foreclose on the property or to execute on Kalhorn's personal guarantees.

38. In his deposition Krilich lamented that Zogheib and Meiszburger turned out to be, in his words, "a couple of con men." In his deposition Meiszburger expressed his dismay that Pham had his property taken from him, but he has remained friends with Zogheib to this day. Based on the evidence presented to this Court, it seems clear that Zogheib, Meiszburger and

Krilich were all crooks, and they conspired to steal money from Kalhorn and to attempt to steal land from Pham.

### C. **Pham's Response**.

39.  At or shortly before the beginning of December 2016 Pham discovered that he was no longer Caballos's managing member of record, and that the property seemed to have been stolen by Kalhorn by the manipulation of the records in the Secretary of State's Office.

40.  Pham sent a cease and desist letter to Kalhorn dated December 1, 2016.  Ex. 52. Kalhorn's attorney responded on January 9, 2017.  Ex. 53.  The attorney stated that Kalhorn had not submitted anything to the Secretary of State regarding Caballos, and that any documents purporting to show otherwise were fraudulent.  *Id.*  The attorney listed Zogheib, Meiszburger, and Krilich as possible suspects and stated that Kalhorn wanted to resolve the issue immediately.

41.  Pham never responded to the attorney's letter.

42.  Apparently both Pham and Kalhorn contacted the FBI and the Las Vegas police, but no charges were filed against anyone.

43.  In March 2017 Pham filed a lawsuit against Kalhorn in a Nevada state court claiming that the ownership of the property had never changed, that he had never resigned as the manager of Caballos, and that Kalhorn had committed fraud.  Kalhorn counterclaimed.  Zogheib, Meiszburger, Krilich, the appraiser Geary, the lawyer Vohwinkel, and a couple of title insurance companies have apparently been named as parties to the case.  The parties' reported that that case, dubbed the "quiet title" action, was set to begin trial on May 24, 2021.

44.  Even though Kalhorn now believes that Pham was the victim, not the perpetrator, of a fraud, he has refused to deed the property back to Pham.  He explains this position by suggesting that Pham was a participant in the fraud, and that somehow that justifies his hanging onto the property until the Nevada court rules in the quiet title action.  However, Kalhorn's

lawyer admitted during the trial that he couldn't prove that Pham was in on the fraud. This Court is not aware of a good faith basis in fact or law for Kalhorn to maintain that he is the owner of the property. Nonetheless, with multiple parties involved in the Nevada litigation, it might be impossible for anyone to do anything with the property until the ownership is straightened out.

45. Pham was not content to await the result of the Nevada litigation, however. In approximately October 2017 Pham and a friend created a website entitled "Stop James Kalhorn.com." Ex. 1. The website contained a photo of Kalhorn labeled "JAMES KALHORN'S MUGSHOT." Beneath the photo it states: "PLEASE PROSECUTE LAND THIEF. CORPORATE IDENTITY FRAUD USING NEVADA SECRETARY OF STATE WEBSITE. PLEASE HELP!" The website continues, "WANTED: STEALING BY DECEIT AND CROSSING STATE LINE TO COMMIT GRAND LARCENY." *Id*

46. The website accused Kalhorn of stealing $5 million without a gun and said that the entire City Council of Las Vegas and the Mayor were "unwittingly . . . assist[ing]" "a total swindler." It accused Kalhorn of having been convicted of fraud in 2001. It explained how Kalhorn had figured out a scheme to "steal millions of dollars without moving much more than his index finger, and no one would be the wiser." It said that he had stolen millions over a 16-month timeframe since December 31, 2015, using his computer and the Nevada Secretary of State's website to take over management of Caballos and then using Caballos's property to borrow approximately $1.75 million. It stated that Kalhorn hired a brokerage firm in late December 2016 to sell the property for $2.6 million "so he could add millions more from this new sale, to the millions he already made with his fraudulent borrowing scheme."

47. The Court finds that none of these accusations about Kalhorn is truthful.

48. There was no evidence concerning who or how many people visited the website. If Pham had stopped there, the present case might not exist.

49.     But the legal process apparently was taking too long, and Pham couldn't resist the temptation to again lash out publicly at Kalhorn.  He told his story to a reporter for the Las Vegas Review-Journal, Brian Joseph.  The reporter apparently did some investigation, although he did not contact Kalhorn.  A scathing expose of the scheme purportedly engineered by Kalhorn, aided by Krilich, Meiszburger, and Zogheib, and facilitated by the Secretary of State was published on May 20, 2018.  Ex. 9. The reporter was later hired to do some work for Pham on one of his projects.

50.     Then Pham and a friend created a flyer with the heading "Corporate Land Thief" in large, bold letters.  Ex. 7.  The flyer contained a photo of "Your Neighbor James Paul Kalhorn, Local Dentist in Colorado Springs, CO."  It referenced the Las Vegas Review-Journal and provided the website where the article could be found.

51.     Pham and the friend flew from Idaho to Colorado Springs on May 25, 2018 armed with hundreds of the flyers and copies of the Review-Journal article.  They went door to door in the neighborhood of Kalhorn's dental practice distributing the flyers and verbally lambasting Kalhorn to anyone who would listen.  Fortunately for Mr. Pham, May 25, 2018 was the Friday before the Memorial Day weekend, and relatively few people were working in the neighborhood that day.  Pham estimated that he gave a flyer and newspaper to about seven people.

52.     Kalhorn learned about the smear campaign while he was in Denver attending his son's graduation from medical school.  He obtained copies of the flyer and newspaper article from a patient who is a paralegal in the law office across the street from his dental office and was working when Pham came to her office and handed copies to her.

53.     After his adventure in Colorado Springs, Pham doubled down by updating his website.  Now captioned "STEALING BY DECEIT AND GRAND LARCENY," the website added a photograph of a smiling Pham holding a copy of the flyer while standing in front of

Kalhorn's dental office. Beneath the Pham photo the website stated, "Jade Dental Professionals located at 711 N Tejon St #200, Colorado Springs, CO 80903 Tel: (719) 633-770. Hiding behind fake reviews of dental professional respectability, convicted insurance fraud artist, James Kalhorn DDS crossed state lines to steal $5 million in real estate."

54.     The number of people who contacted the Review-Journal website or Pham's "Stop James Kalhorn" website is unknown. No evidence was presented that the flyer caused Kalhorn to lose dental patients. The paralegal who received a flyer and newspaper from Pham, Yvonne Serna, was a patient of Kalhorn's. She testified that she was initially shocked by the things that were being said about Kalhorn, but ultimately she decided that they probably were not true because her friend who worked for Kalhorn wouldn't be working for him if those things were true. Plaintiff played a recording of an anonymous negative message left on the dental office's voice mail shortly after Pham's May 25, 2018 escapade, ex. 8, and apparently Kalhorn's ex-wife learned of the things that were being said about him and expressed concern. Otherwise, with the exception of the two individuals discussed next, the impact of the flyers on Kalhorn's reputation is unknown.

**D.  Matthias Bober.**

55.     As indicated earlier, Kalhorn and his friend David Pate, the tennis coach, had formed Prometheus Dos, Inc. for the purpose of investing in Xamay. They were equal owners. Prometheus Dos owned 32.34% of Xamay. Kalhorn had asked two friends, David Zallar and Matthias Bober, to consider investing in the tequila company. He provided information about Xamay to Zallar and Bober, including its business plan, promotional materials, and bottles of the three types of tequila the company was manufacturing and selling.

56.     Zallar died in December 2019. His deposition was not taken before his death. Although plaintiff's counsel attempted to have Kalhorn testify about Zallar's statements

concerning his potential interest in investing in the tequila company, defendant's objections were sustained.

57. However, Bober did testify at trial. He indicated that he "absolutely" was considering investing in the tequila company. He variously indicated that he was considering investing in Xamay, Alma de Agave Tequila and Prometheus Dos, but he emphasized several times that the details of how the investment would be made had not yet been worked out and would be handled by his attorney. He described his potential investment as being in the "fetal stage," and he acknowledged that he hadn't yet done his due diligence on the investment. However, he was seriously considering investing $350,000 to $400,000. He and Kalhorn had not discussed any anticipated rate of return on his investment, nor had they discussed what percentage ownership he would acquire, again because they were in "a very early stage of doing this." Bober acknowledged the risk involved with any investment, and that he could make or lose money but he also was aware that the actor George Clooney had bought a tequila company for "pennies on the dollar" and later sold his interest for more than a billion dollars. He added that he had talked with other associates of his, including physicians, and believed they had an interest in investing in the tequila business too.

58. Unfortunately for Kalhorn, Zallar learned about Pham's flyer. In turn Zallar told his friend Matthias Bober about it. After receiving the flyer, reading the accusations concerning Kalhorn on Pham's website, and discussing the situation with Zallar, Bober "gracefully bowed out" of his potential commitment to invest in the tequila company. He did so because he was "extremely" disturbed by Pham's accusations and no longer felt comfortable investing a substantial sum of money in a business with Kalhorn, even though he still thinks well of him and continues to use Kalhorn as his dentist. Although the potential investment was in the "fetal

stage," he believes he would have made the investment but for Pham's flyer and website. Bober's associates who had indicated a potential interest in investing also backed away.

59.     The Court finds that Bober probably would have invested between $350,000 and $400,000 in Xamay but for Pham's disparagement of Kalhorn.

**E.  The Present Case**.

60.     Kalhorn contacted his lawyer, and they decided to file a defamation suit.  Kalhorn filed this case on July 5, 2018.  He filed a second, similar suit in the name of Prometheus Dos, Inc. on March 30, 2020.  The two suits were consolidated and were tried together.

## ANALYSIS AND CONCLUSIONS

**A.  The Claims in the Two Cases.**

In Case No. 18-cv-01685-RBJ, Kalhorn asserted five claims for relief against Pham: (1) libel per se based on the flyer; (2) libel per se based on the website; (3) slander per se based on Pham's statements to neighbors of Kalhorn's dental practice; (4) tortious interference with his prospective business advantage with dental patients; and (5) tortious interference with his prospective business advantage with "his company, Alma Tequila."  ECF No. 16 (Amended Complaint).  Case No. 20-cv-00846-RBJ, Prometheus Dos, Inc. asserted one claim for relief for tortious interference with prospective business advantage, based upon plaintiff's prospective relationships with investors who would invest money in Xamay.  ECF No. 105 (Second Amended Verified Complaint) at 10.  Prometheus Dos also asserted what purported to be a second claim for exemplary damages.  The two cases are based on essentially the same facts.

**B. <u>Kalhorn's Defamation Claims</u>.**

At the outset the Court dismisses Kalhorn's claims Three and Four. Regarding Claim Three, there was no specific evidence of what Pham said to anyone other than Ms. Serna when he was in the vicinity of Kalhorn's dental office on May 25, 2018. He made a few false statements about Kalhorn to Ms. Serna, but she did not believe them; and, in any event, the oral statements were essentially obscured by the flyer that he handed out at the same time. Regarding Claim Four, there was no evidence that Kalhorn's dental practice suffered from his defamatory campaign. Indeed, the two patients who testified, Ms. Serna and Mr. Bober, both remained patients of Kalhorn's despite their receipt of the flyer and, at least in Bober's case, review of the Pham's website.

The Court does find, however, that plaintiff has proven Claims One and Two. To prove libel per se under Colorado law a plaintiff must first prove, by a preponderance of the evidence, that the defendant published a written statement that caused the plaintiff actual damage; and also prove, by clear and convincing evidence, that the substance or gist of the statement was false when it was published, and that the defendant either knew that it was false or made the statement with reckless disregard as to whether it was false.[1]

---

[1] During his closing argument defense counsel suggested that Nevada law applies in this case because the Lone Mountain property is in Nevada. The parties did not brief or argue choice of laws issues in any meaningful way. However, the defamation was launched from Colorado. The plaintiff in the case is a Colorado resident. The lost investment was to be made by a Colorado investor. The Court is satisfied that Colorado has a substantial interest, indeed the most substantial interest, in the issues in this case, even though the property is in Nevada, and its ultimate ownership and related events regarding the potential liabilities of the individuals and entities who were involved in the property transactions took place mostly in Nevada. Presumably, Nevada law will be applied in the quiet title action, but this Court will apply Colorado law to the issues in this case. I haven't been shown that the two states' laws are different in a dispositive way in any event.

The several derogatory statements in the flyer and on the website discussed above were published by Pham and caused actual damage to Kalhorn to the extent that Xamay's loss of Bober's proposed investment indirectly damaged Kalhorn. The statements were clearly false. Pham has asserted "truth" and "partial truth" as defenses. The Court rejects those defenses because the statements were neither true nor partially true.

Pham has also asserted as a defense that he was entitled to comment on a matter of public interest. However, the Court finds that the focus of his defamatory campaign was on his private dispute with Kalhorn. The only public component was the fact that the Nevada Secretary of State's website was used by Zogheib to fraudulently change the name of the managing member of Caballos. That fact might have been a motivating factor in the decision of the Las Vegas Review-Journal to publish an article about the events. But the Secretary of State's involvement is incidental to the underlying fraud.

Finally, I find and conclude that Pham's statements in the flyer and the website were not only false, but that they were made with reckless disregard of their truth or falsity. Pham did not know, and indeed could not have known because it was not true, that Kalhorn ever went on the Nevada Secretary of State's website or that he, directly or indirectly, changed the management of Caballos by changing its registration on that website. He did not know, and again could not have known because it was not true, that Kalhorn had been convicted of fraud, or that he had committed or was wanted for stealing by deceit or for grand larceny.

Pham had an opportunity to get the facts straightened out. He sent a letter to Kalhorn on December 1, 2016, in which he described himself as the managing member of Caballos; accused Kalhorn of making false and fraudulent filings about Caballos with the Nevada Secretary of State on December 15, 2015 and January 28, 2016; and demanded that Kalhorn cease and desist from any attempts to falsely amend Caballos's state filing. Ex. 52. Kalhorn's lawyer responded on

January 9, 2017 and indicated not only that Kalhorn had never submitted any paperwork to the Nevada Secretary of State regarding Caballos, but that any documents that might have been submitted with Kalhorn's signature were fraudulent. Ex. 53. The letter requested copies of the documents; said that they would be submitted to a handwriting expert; indicated that the results of the expert's investigation would be turned over to authorities; identified Zogheib, Meiszburger and Krilich as possible suspects; and indicated that Kalhorn wanted to get to the bottom of the matter immediately. *Id.* But Pham did not respond.

There is no evidence that Pham made any other meaningful effort to verify his suspicions. Instead, acting as an uninformed vigilante, he chose to publish his defamatory statements about Kalhorn in two different media. That amounts to reckless disregard of the truth or falsity of the statements.

**C.  Kalhorn's Claims for Tortious Interference with Prospective Business Advantage.**

Tortious interference with a prospective business advantage "requires a showing of intentional and improper interference preventing formation of a contract." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995). "It is not necessary to prove an underlying contract. It is sufficient to show intentional and improper interference preventing formation of a contract." *Dolton v. Capitol Federal Sav. And Loan Ass'n*, 642 P.2d 21, 23 (Colo. App. 1981).

Pham intentionally and improperly published false and defamatory information about Kalhorn. It had to be obvious to Pham that there was the potential that his statements would cause harm to Kalhorn. I infer that one purpose of Pham's acts was to hold out Kalhorn to the public in a bad light and to secure any help there might be in regaining the property that he believed had been stolen by Kalhorn. Finally, I have found that Matthias Bober probably would

have invested between $350,000 and $400,000 in the tequila business had it not been for Pham's defamatory statements about Kalhorn.

However, there is no evidence that Pham was aware of Kalhorn's tequila investment or of Kalhorn's efforts to persuade Bober or others to invest in the tequila business. The legal question thus is whether, even if Pham's intentional and improper conduct caused Bober to back out of his potential investment, Kalhorn must also prove that Pham had some knowledge of the prospective business advantage with which his conduct interfered? The law in this circuit and district is not clear on that question.

The leading Colorado cases, *Dolton* and *Amoco*, do not list defendant's knowledge as a requisite element. Both cases do cite the Restatement (Second) of Torts § 766B. Comment d provides, "[t]he intent required for this Section is that defined in § 8A. The interference with the other's prospective contractual relation is intentional if the actor desires to bring *it* about or if he knows that *the interference is certain or substantially certain to occur* as a result of his action." *Id.* (emphasis added). That, too, is not clearly dispositive of the issue.

Plaintiff relies primarily on an unpublished Tenth Circuit case that says that knowledge of a specific prospective business relationship is not an element of the claim. *Personnel Department, Inc. v. Professional Staff Leasing Corp.*, 297 F. App'x 773, 777 (10th Cir. 2008) (unpublished). The court wrote that "[c]ontrary to ProLease's position, several Colorado courts have held that, in a tortious interference with prospective business relations case, it is 'not necessary that [the plaintiff] identify a *specific* customer relationship or a *specific* customer' with whom he or she had a prospective relationship." *Id.* at 777 (quoting *Ervin v. Amoco Oil Co.*, 885 P.2d 246, 254 (Colo. Ct. App. 1994), *rev'd on other grounds*, 908 P.2d 493, 502 (Colo. 1995)) (emphasis added). The *Personnel Department* court also reviewed a published District of Colorado case, *Seidl v. Greentree Mortgage Co.*, 30 F. Supp. 2d 1292 (D. Colo. 1998). The

court determined that the two cases on which *Seidl* relied dealt with *existing* contracts, and thus the Tenth Circuit rejected *Seidl's* holding.  It concluded, "[w]e are convinced that Colorado law does not require a tortious interference with prospective business relations plaintiff to prove that the defendant had knowledge of a *specific* potential purchaser."  *Personnel Department*, 297 F. App'x at 778 (emphasis added).

Defendant cites an unpublished District of Colorado case that *does* include defendant's knowledge of the contract or prospective business relationship as an element of intentional interference with contract or prospective business relations (i.e., it lumped both existing and prospective contract claims together when listing out the elements):

> To state a claim for intentional interference with contractual relations or prospective business advantage, a plaintiff must allege facts in support of the following elements: (1) the existence of a valid contract or reasonable prospect of having a business relationship; *(2) that the defendant knew of the contract or prospective relationship;* (3) the defendant intended to induce a breach of the contract or interfere with the prospective business relationship; (4) defendants engaged in conduct which produced a breach of contract or prevented the plaintiff from acquiring or continuing a prospective business relationship; (5) the interference was improper; and (6) the plaintiff suffered damages.

*Zimmer Spine, Inc. v. EBI, LLC*, No. 10-cv-03112-LTB-CBS, 2011 WL 4089535, at *2 (D. Colo. Sept. 14, 2011) (emphasis added).  But, in my view, the two cases cited in *Zimmer* for this proposition (*Memorial Garden, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207, 201 (Colo. 1984) and *Amoco Oil*) do not necessarily support it.  Neither case says that knowledge by defendant is a required element for interference with prospective business relations.  Defendant also cites other District of Colorado cases for this proposition, but each of them simply restates the elements in *Zimmer* and cites to *Zimmer.*  Many of them also cite these elements for a claim for interference with *existing* contracts, but not prospective business relations.

In *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1122 (10th Cir. 2008), the court included "defendants knew of the contract's existence" as an element of tortious interference with *current/existing* business relations. The court then went on to say, "[t]ortious interference with prospective business relations requires identical elements, with the exception that an existing contract need not be alleged." *Id.* That suggests that knowledge is a required element of the prospective business relations claim. Then again, that case was decided the same year as *Personnel Department*, which means that the court would presumably have been aware of both cases and believed their holdings didn't conflict. And in a recent (unpublished) Tenth Circuit case, the court said the elements across the two claims were "similar," not the same. *Dawson v. Litton Loan Servicing, LP*, 680 F. App'x 662, 665 (10th Cir. 2017) (unpublished).

In sum, in *Personnel Department* the court concluded that knowledge of a *specific* prospective business advantage is not required. But *Campfield* and *Dawson*, along with the Restatement 2d of Torts' intent definition, indicate that the defendant must have knowledge of *something* related to plaintiff's business in order for the tort to be established. It is, after all, an intentional tort.

Here, Pham knew of Kalhorn's dental practice, as he purposefully handed out flyers in front of it, and it is reasonable to infer that he intended to interfere with Kalhorn's prospective relationships with present and future patients. The claimed damages are not for loss of dental patients per se. But Kalhorn's relationship with Bober grew out of their relationship as dentist and patient. His libelous statements did not cause Bober to change dentists, but they did cause Bober to back out of an investment he had committed to make due to his relationship with Kalhorn. I conclude that Pham's intentional and improper attempt to interfere with Kalhorn's relationship with his dental patients, on the facts of this case, satisfies the requirement that he

must have had knowledge of something related to Kalhorn's business. Accordingly, I conclude that Kalhorn has proven his Fifth Claim for Relief against Pham.

**D. Prometheus Dos's Claim for Tortious Interference with Prospective Business Relations.**

My implication of Pham's knowledge that his conduct would likely interfere with Kalhorn's relationships with his dental patients does not extend to Prometheus Dos, which is a 50-50 partnership of Kalhorn and David Pate. It is one thing to interfere with Kalhorn's prospective business relationships but quite another to interfere with Pate's prospective business relationships. There is no way that Pham could have predicted that his libelous statement about Kalhorn might interfere with Pate's prospective business relationship, through Prometheus Dos, with the tequila company. Accordingly, the Court dismisses the one claim asserted by Prometheus Dos.

**E. Damages.**

Plaintiffs' counsel argued at trial, and in a post-trial brief, that Prometheus Dos should be awarded at least $350,000 in compensatory damages because of the loss of Bober's investment. However, because the Court has dismissed the claim asserted by Prometheus Dos, the argument is moot.

The question remains, what damages have been sustained by Kalhorn. Kalhorn suggests that he sustained $350,000 to $400,000 in damages because Bober's investment was lost. But Bober wasn't gifting $350,000 or $400,000 to Kalhorn or to Prometheus Dos. Whether the funds would have been delivered to Kalhorn, or to Prometheus Dos, or directly to Xamay, Bober's intent was to invest in a tequila company. The ultimate loss of the investment was sustained by Xamay, which was not a party to the case.

Another theory is that Prometheus Dos's loss was its percentage of Xamay stock (32.34%) multiplied by the amount of the investment. I have not found liability in favor of Prometheus Dos. But the theory, applied to Kalhorn's interest in Xamay, would be that he sustained the loss of 16.17% of the investment. That would put damages in the range of $56,595 to $64,680, depending on the amount Bober ultimately decided to invest. But setting aside whether a shareholder of a closely held company has a right to sue for damages in his own name based on an act that harmed the company, to apply a percentage of stock ownership to the lost investment ignores the fact that Bober would have been issued a percent of the ownership, and thus that Kalhorn's ownership through Prometheus Dos would have been diluted. No evidence was presented that would enable the Court to determine the effect on Kalhorn with mathematical precision.

On the other hand, defendant's argument that Kalhorn did not prove that he sustained any damage rings hollow. Pham's conduct did indirectly cause damage to Kalhorn. Xamay lost the opportunity to use the funds for the benefit of its shareholders. It is also reasonable to infer that Kalhorn sustained at least some non-economic damage arising from having false and extremely derogatory statements published about him on the Internet and in his hometown. The damage to his reputation is difficult to measure, as is the emotional distress one would experience in such circumstances. It is well settled in Colorado, however, that difficulty in determining the precise amount of damages does not prevent the Court from deciding an amount. *See* CJI-Civ. § 5:6 (2020). The Court must use its best judgment based on the evidence. *Id.* That exercise of judgment also takes into consideration the context, which is that Kalhorn to some extent brought the situation on himself by his participation in a harebrained scheme with people he did not know. That participation in turn has embroiled him, Pham, and several others in four years of costly litigation in Nevada.

Taking all factors into account, both economic and non-economic, the Court awards general compensatory damages in the amount of $70,000. Because there was no prayer for exemplary damages in Case No. 18-cv-1685-RBJ, the Court does not address whether exemplary damages should be awarded. The Court does hope, however, that this case will serve as an example to others who might be tempted to engage in a smear campaign rather than letting the law take its course.

These damages are awarded on each of the three counts on which Kalhorn prevailed. However, the damages can be awarded only once. I say that to make clear that Kalhorn is awarded $70,000, not three times that amount. Kalhorn is also awarded prejudgment and post judgment interest. Prejudgment interest in a diversity action in federal court is a substantive matter governed by state law. *See Hofer v. Unum Life Ins. Co. of America*, 442 F.3d 872, 878 (10th Cir. 2006). Defamation is considered to be a personal injury in Colorado. *James v. Coors Brewing Co.*, 73 F. Supp. 2d 1250, 1257 (D. Colo. 1999) (citing *Brooks v. Jackson*, 813 P.2d 847, 848–49 (Colo. App. 1991)). Therefore, I will calculate prejudgment interest in this case pursuant to Colo. Rev. Stat. § 13-21-101. Under § 13-21-101, interest is calculated at 9% per annum from the date the action accrued to the date suit was filed and at 9% compounded annually from the date suit was filed to the date of judgment.

## ORDER

1. The Court directs that judgment enter in favor of the plaintiff, Dr. James Kalhorn, and against the defendant, Andy Pham, in Case No. 18-cv-01685-RBJ in the amount of $70,000, plus prejudgment interest pursuant to Colorado law, post judgment interest at the federal rate as at the date of judgment, and costs to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and

D.C.COLO.LCivR 54.1.  The Court calculates the prejudgment interest at $20,525.41.[2]

Therefore, as of May 25, 2021 the total judgment for damages and prejudgment interest is

$90,525.41 plus costs to be taxed by the Clerk and post judgment interest at the federal rate.

      3.  The Court directs that judgment be entered in favor of the defendant, Andy Pham, and

against the Plaintiff, Prometheus Dos, in Case No. 20-cv-00846-RBJ.  That case is dismissed

with prejudice.  As the prevailing party Pham is awarded his reasonable costs incurred in

defending that case to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and

D.C.COLO.LCivR 54.1.

      DATED this 25th day of May, 2021.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

---

[2] The calculation is:

| | |
|---|---|
| May 25, 2018-July 3, 2018: | 673.15 |
| July 4, 2018-July 3, 2019: | 6,300.00 |
| July 4, 2019-July 3, 2020: | 6,867.00 |
| July 3, 2020-May 25, 2021 | 6,685.26 |
| TOTAL INTEREST TO DATE OF JUDGMENT: | $20,525.41 |

Tortious interference with prospective business advantage probably would not be considered a "personal injury," and if not, prejudgment interest would be calculated pursuant to Colo. Rev. Stat. § 5-12-102.  The amount would be somewhat less than prejudgment interest on the defamation counts.  I have not made that calculation.